IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,105

STATE OF KANSAS,
*Appellee*,

v.

ELTON L. SHERMAN,
*Appellant*.

SYLLABUS BY THE COURT

1.

The right to a fair trial is a fundamental liberty secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

2.

Once a point of law has been established by a court, it will generally be followed by the same court and all courts of lower rank in subsequent cases when the same legal issue is raised. Stare decisis operates to promote system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by a court. The application of stare decisis ensures stability and continuity—demonstrating a continuing legitimacy of judicial review. Judicial adherence to constitutional precedent ensures that all branches of government, including the judicial branch, are bound by law.

3.

Stare decisis is not a rigid inevitability but a prudent governor on the pace of legal change. A court of last resort will follow that rule of law unless clearly convinced it was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.

4.

The "particularized harmlessness inquiry" commanded by *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), is overruled.

5.

Whenever a claim is asserted that any act of a prosecutor has denied a criminal defendant his or her due process rights to a fair trial, we will refer to the claim and resulting judicial inquiry as a claim of "prosecutorial error."

6.

Appellate courts will continue to employ a two-step analysis to evaluate claims of reversible prosecutorial error. These two steps can and should be simply described as error and prejudice.

7.

To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial.

8.

In evaluating the prejudice step of our two-step analysis for reversible prosecutorial error, appellate courts shall look no further than, and shall exclusively apply, the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Prosecutorial error is

harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.

9.

We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, an appellate court need only address the more demanding standard of constitutional error.

10.

Multiple and varied individualized factors can and likely will affect the *Chapman* analysis in future cases. Every instance of prosecutorial error will be fact specific, and any judicial review for prejudice must likewise allow the parties the greatest possible leeway to argue the particulars of each individual case. Courts must simply consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.*, shown that there is no reasonable possibility that the error contributed to the verdict.

11.

Prosecutorial acts properly categorized as "prosecutorial misconduct" are erroneous acts done with a level of culpability that exceeds mere negligence. A prosecutor who acts with knowledge and intent outside the wide latitude afforded prosecutors, or with a malicious or gross disregard for the fair trial rights of the defendant, is subject to sanction for such misconduct in a separate proceeding outside the confines of the criminal case within which the misconduct occurred.

12.

Sanctions for prosecutorial misconduct may take one of two forms, or both. The traditional remedy of a disciplinary referral for a determination of ethical violations is one form, and it remains a distinct likelihood when misconduct is an issue. In addition, courts must affirmatively act to punish and deter particularly egregious prosecutorial acts. All Kansas courts must discharge their duty to oversee the criminal justice system and ensure its integrity by issuing on the court's own motion—in any circumstances where the court determines prosecutorial misconduct likely occurred—orders to offending prosecutors, to be heard in separate proceedings, to show cause why the prosecutor should not be found in contempt of court for his or her misconduct. A prosecutor who knowingly and intentionally disregards the dictates of justice in Kansas courts does so at his or her peril.

13.

Appellate courts review a district court's decision denying a motion for mistrial under an abuse of discretion standard.

14.

In determining whether a district court abused its discretion in denying a motion for mistrial, an appellate court asks:  (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?

15.

Violations of K.S.A. 60-455 are subject to the nonconstitutional harmlessness standard of K.S.A. 2015 Supp. 60-261. Under that standard, the party benefitting from

4

the error has the burden of showing that there is no reasonable probability the error affected the trial's outcome in light of the entire record.

Appeal from Crawford District Court; A.J. WACHTER, JR., judge. Opinion filed September 9, 2016. Affirmed.

*Meryl Carver-Allmond*, of Capital Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Michael Gayoso, Jr.*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  Today, we narrow and rename our judicial review of prosecutorial behavior when such review occurs within a criminal appeal. Whenever we act inside the confines of a criminal appeal, we will henceforth review prosecutorial behavior for—and describe such conduct as—"prosecutorial error." See, *e.g.*, American Bar Association House of Delegates, Recommendation 100B (2010) (recommending "trial and appellate courts, in criminal cases, when reviewing the conduct of prosecutors [should] differentiate between 'error' and 'prosecutorial misconduct'"). Just as significantly, today's decision articulates a standard by which certain prosecutorial acts may properly be categorized as "prosecutorial misconduct" and appropriately sanctioned in separate proceedings occurring outside the confines of a criminal appeal. We announce these changes in the context of Elton Sherman's appeal of his convictions for first-degree felony murder and aggravated battery.

Sherman asserts three claims of reversible error on appeal. Principally, Sherman alleges that prosecutorial misconduct denied him his due process right to a fair trial

5

guaranteed to him by the Fourteenth Amendment to the United States Constitution. Second, Sherman alleges the district court erroneously denied his motion for mistrial after the State introduced evidence of Sherman's prior convictions in violation of a pretrial order in limine. As a final contingent claim, Sherman asks that if we find reversible error, we likewise grant Sherman some form of relief to address the alleged prejudice he has suffered as a result of the unusual and improper 7-year delay in Sherman's appeal.

With respect to the primary issue here—prosecutorial misconduct—both Sherman and the State urge us to reconsider and alter the legal tests we have applied to such claims since our holding in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004). On the one hand, Sherman asks that we eliminate ill will as a factor in our analysis because it distorts the ultimate question of whether the prosecutor's actions denied the defendant a fair trial and creates a de facto heightened harmlessness standard:

> "[T]he overarching question for the second step of a prosecutorial misconduct analysis is whether the misconduct prejudiced the jury against the defendant and denied the defendant a fair trial. . . .
> "But ill will has very little to do with that. . . . [A] prosecutor may act with the blackest of hearts and yet his comments may ultimately have no impact on the jury. Or she may innocently bumble into a mistake of law that dramatically alters how the jury sees a case."

On the other hand, the State urges us to adopt the nomenclature of "error" and reserve the term "misconduct" for extreme cases of intentional or malicious acts:

> "[D]ifferentiating between a malicious and improper intentional act by the prosecutor and one that was a mistake . . . provides clarification by this Court as to the level of gravity [of] the prosecutor's actions in the particular case. . . . This differentiation can be done when this Court determines if the conduct was committed with ill will."

6

At oral argument, in a rare moment of clarity and consensus between the defense and prosecutorial bars, counsel for both parties indicated their mutual agreement with both prongs of the criticism being leveled at our *Tosh* rubric. We commend counsel, and so as not to squander the opportunity presented by both parties to improve our jurisprudence in this area, we have conducted a thorough review of *Tosh* and its progeny. In short, we agree with the criticisms of *Tosh* and adopt a modified approach that accords with the best interests of defendants, prosecutors, victims, and society at large. We conclude that our modified approach will more effectively and fairly preserve and protect the integrity of our constitutionally defined criminal justice system.

Though today we make a significant departure from both the nomenclature and the legal test we will apply to what have historically been known as prosecutorial misconduct claims, we emphasize that we are all too aware that the behaviors properly described as prosecutorial misconduct do still occur in Kansas. The power of the State to charge and prosecute its citizens for criminal violations of the law is a fearsome one, and it is vested exclusively in a prosecutor who is given vast discretion to make both charging decisions and the myriad of practical and strategic decisions that occur in the course of a prosecution. "The prosecutor has more control over life, liberty, and reputation than any other person in America." Robert H. Jackson, U.S. Attorney Gen., The Federal Prosecutor, Address Before the Second Annual Conference of United States Attorneys (April 1, 1940). To suffer an abuse of this power at the hands of an unethical prosecutor is one of the grossest inequities and indignities that can be visited upon a citizen by the State. Such abuse cannot be tolerated in a free society.

Therefore, we wish to make it clear from the outset that today's decision does not eliminate the category of prosecutorial misconduct from our review and oversight of the criminal justice system as a whole. We merely remove it from inside the formal bounds

7

of a criminal case. In so doing, as explained in detail below, when reviewing and supervising a criminal prosecution, the judiciary can more effectively keep our focus on and vindicate the dual interests of justice that are present in a criminal case—*viz.*, the rights of the defendant to receive a fair trial and society's need to punish and deter crime. Concurrently, when and if it is warranted, we can more effectively evaluate, punish, and deter the actions of rogue prosecutors when we do so in a separate proceeding outside the four corners of a criminal case.

We are convinced by experience, reason, and a thorough review of the caselaw and history from numerous jurisdictions, that the approach we announce today will benefit every party concerned—from defendants whose constitutionally protected right to a fair trial will now become the sole focus of our prosecutorial error analysis; to victims of crime and society at large who will no longer have to endure the possibility that an otherwise constitutional conviction might be reversed simply to punish a prosecutor's bad acts; to the vast majority of our State's fine and ethical prosecutorial corps who need no longer fear that their every mistake will be tinged with the hint of unethical behavior and who will be quite happy, we surmise, as proverbial good apples, to see the bad apples removed from the barrel or otherwise appropriately pared.

FACTUAL AND PROCEDURAL BACKGROUND

A jury convicted Elton Sherman of first-degree felony murder for the killing of Cecilio Mendez done while committing an aggravated battery against William Chirod Lewis. It was undisputed at trial that Sherman and Lewis knew each other—Lewis' wife was Sherman's girlfriend's sister. The two would see each other at family gatherings but were not close friends. On the night of the killing, both Lewis and Sherman were at Lewis' home. Sometime that night, Mendez was discovered by law enforcement outside

8

of Lewis' home, alive but with a severe head injury. Mendez lapsed into a coma and died 2 weeks later. Lewis had also suffered a head injury that evening.

The remaining facts were disputed. The evidence presented to the jury consisted primarily of conflicting testimony between Lewis and Sherman. Lewis testified he and his wife, Laura Lewis, met Mendez during Thanksgiving day. They were walking from the family gathering (hosted by an aunt) to the store when they saw Mendez and asked him for a ride. Mendez agreed and Lewis testified he told Laura to try to get some money from Mendez. Laura sat in the front seat of Mendez' car, flirting. She gave Mendez her telephone number, and Mendez gave them some money for beer and a ride back to the family gathering.

Lewis testified that later that night, he, Laura, Sherman, and Laura's sister (Sherman's girlfriend), Rozanna Heilig, arrived at Lewis' home sometime after the family Thanksgiving celebration. Mendez and Laura then talked on the phone, and she left with Heilig to meet Mendez. The two returned a while later with 60 dollars from Mendez and arrangements to meet again the next day. Lewis testified that he told Sherman about the scheme to con Mendez out of money by enticing him with Laura and her sister.

The next day, Mendez again met with Laura, but she returned home shortly thereafter because Mendez was asking for Heilig instead. Lewis testified that Heilig teased Sherman as a result, and Sherman became upset. The group proceeded to allow Mendez to believe he could see Heilig if he came to the house the following day. Lewis testified there had been no discussion of robbing Mendez outright.

On Saturday night, Mendez showed up at Lewis' home. Lewis was walking around the house to meet Mendez at the back door, and as he approached Mendez, he testified that he felt a "hit" on the top of his head. Lewis fell forward onto Mendez, and Mendez

9

fell backwards with Lewis on top of him. Lewis looked up to see Sherman hitting Mendez in the face with a stick. Lewis said Sherman hit Mendez two to three times with the stick. After Sherman stopped hitting Mendez, he told Lewis to get his wallet. Lewis then took Mendez' wallet and carried it with him into the house.

In addition to finding Mendez, law enforcement also discovered physical evidence at or near the scene of the crime. Most notably, an officer found a tree limb on the ground next to Mendez' feet with Mendez' blood and tissue on it. The autopsy revealed injuries consistent with being struck forcefully with a tree limb.

In contrast with the rendition of events provided by Lewis, Sherman testified that he came out of Lewis' house only to discover Lewis kneeling over an injured Mendez, rifling through his pockets and bleeding from a head injury of his own. Sherman had given a prior statement to police—which he later claimed was false—that Lewis and Mendez had attacked him and that he inflicted the wounds on Lewis and Mendez in self-defense.

During voir dire, the prosecutor repeatedly tried to discuss the reasonable doubt standard with prospective jurors, though most efforts were disallowed by the district court. One key exchange follows:

> "[Prosecutor]: All right. And everybody knows the burden of proof is beyond a reasonable doubt. It's the highest burden in law, but it doesn't mean that there can't be any doubt in the case because there's always some doubt.
> "[Court]: Well, let me instruct the jury at the appropriate time on reasonable doubt.
> "[Prosecutor]: Okay
> "[Court]: I think that's a self-explanatory term—
> "[Prosecutor]: Okay.

10

"[Court]:  —at least unless—

"[Prosecutor]:  You'll be given an instruction on that. I was kind of going maybe the concept [*sic*].

"[Court]:  I'm not going to define it in the instructions other than reasonable doubt.

"[Prosecutor]:  Okay.

"[Court]:  Unless you convince me otherwise.

"[Prosecutor]:  All right. Let me kind of go to that area. Any time something occurs whether it be a crime or not a crime for a civil case we're not there. If you're not a witness to it and you're on a jury that means you didn't see it happen so you don't have a complete picture in time as to what happened so you have to listen to the evidence and get what the story is about from either testimony or physical evidence. And you're allowed to use your inferences as an adult in putting the story together. In fact, you are the trier of fact in the case. You decide guilt or innocence. That's your job as a jury. Like an example would be here's a picture of a globe. I know it's small.

"[Court]:  I hate to interrupt you, but I don't want you to use demonstrative stuff on voir dire. If you would please just question the jury I'd appreciate it. Thank you very much. *You can use that stuff in closing argument.*

"[Prosecutor]:  I will, your honor.

"[Court]:  Let's just question the jury at this point.

"[Prosecutor]:  Thank you. Let me go through one example. Say it's a winter day like we've had the last few weeks. We've had snow on the ground and you come outside and you see some tracks in the snow.

"[Court]:  Again, you're being argumentative.

"[Prosecutor]:  I'll move on, Your Honor." (Emphasis added.)

Particularly notable is the dual-sided fact that the prosecutor repeatedly tried to discuss reasonable doubt with analogies, even using demonstrative exhibits, which the district court blocked during voir dire but told the prosecutor, "You can use that stuff in closing argument."

11

At trial, during the rebuttal portion of the State's closing argument, the prosecutor referenced a slide in a powerpoint presentation that showed Mount Rushmore with Theodore Roosevelt's face removed. Above the drawing were the words: "Do you have a REASONABLE DOUBT this is Mt. Rushmore??" Below the drawing were the words: "Even though you can't see all four figures!!" The prosecutor told the jury:

> "Didn't really get to talk to you about reasonable doubt too much. I'm going to show you one diagram though. Not all the gaps are going to be filled by the state in this case. Every case always has some gaps. And like the jury instructions said it's up to you to listen to the witnesses['] testimony and use your life experience and inferences as to what happened in this case.
> "Do you have any reasonable doubt that's Mt. Rushmore? But there's a gap. You're allowed to fill in those gaps, folks."

Also relevant to Sherman's claims on appeal is the motion in limine Sherman filed prior to trial. The motion sought and obtained an order "[d]irecting the prosecution and all prosecution witnesses to refrain from introducing evidence regarding Defendant's prior criminal convictions, criminal history or prior bad acts." During trial, the State began to play for the jury the tape of Sherman's police interrogation which, in part, included evidence of Sherman's prior criminal activity in violation of the order in limine. The district court said the tape should be stopped and instructed the jury to "unring the bell" and disregard any references to arrest warrants, saying, "They're irrelevant. They mean nothing." The district court then began discussing how to redact the statements from the tape. That day of trial then ended with the district court ordering the tape be sanitized by the State and directing Sherman's counsel to write an admonition to the jury to give at the start of the next day.

The following day Sherman moved for a mistrial on the grounds that the State had violated the order in limine and introduced evidence in violation of K.S.A. 60-455. In

discussing the motion for mistrial, the district court described two instances of inadmissible evidence heard by the jury before the tape was stopped: (1) a comment that Sherman had been *Mirandized* previously; and (2) a statement that Sherman had not called 911 on the night of the attack because he had an outstanding warrant for his arrest. The district court noted that both parties had transcripts of the tape yet the issue had gone unaddressed. Further, the district court said Sherman's motion in limine did not specifically call the court's attention to the tape or otherwise reference the tape. Finally, the district court opined that the problems could have been identified by the defendant at an earlier time. Ultimately, the district court denied the motion for mistrial.

The jury convicted Sherman, and the district court sentenced him to life without the possibility of parole for 20 years for first-degree murder.

Following sentencing, Sherman filed a timely notice of appeal on August 10, 2007. Despite this, Sherman's appeal was never docketed and went unaddressed until Sherman wrote to the district court asking about the status of his appeal in 2014. The letter resulted in the district court appointing appellate counsel for Sherman and the current appeal. The district court's order indicates that in 2007, trial counsel requested and received transcripts from the trial after sentencing, but the record is insufficient to explain why the delay occurred.

ANALYSIS

*The Prosecutor Did Not Err Because at the Time of Trial, the Methods Used Were Within the Prescribed Wide Latitude Afforded Prosecutors.*

1. *A Short History of Prosecutorial Misconduct Claims Leading to Our Decision in* State v. Tosh

13

The jurisprudence surrounding policing prosecutors during trial has historically taken as its lodestar—in almost all cases—the due process requirements of the Fourteenth Amendment. The Fourteenth Amendment "imposes minimum standards of fairness on the States, and requires state criminal trials to provide defendants with protections 'implicit in the concept of ordered liberty.'" *Danforth v. Minnesota*, 552 U.S. 264, 269-70, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S. Ct. 149, 82 L. Ed. 288 [1937]). "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976) (citing *Drope v. Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 [1975]). "'A fair trial in a fair tribunal is a basic requirement of due process.'" *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 [1955]). Thus, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).

While we recognize that certain prosecutorial acts may violate protected constitutional rights beyond the basic due process rights to a fair trial, the vast majority of cases of prosecutorial misconduct are analyzed through the lens of due process. Our decision today is expressly limited to such claims and will not impact our treatment of possible violations of other constitutional guarantees—for example, the guarantee of equal protection. See, *e.g*, *Powers v. Ohio*, 499 U.S. 400, 402, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (exclusion of jurors based on race can violate the Equal Protection Clause whether or not the defendant and the excluded juror are the same race); *Batson v. Kentucky*, 476 U.S. 79, 88, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (concluding that choosing jurors on racial grounds contravenes the Equal Protection Clause of the Fourteenth Amendment); *Bordenkircher v. Hayes*, 434 U.S.

14

357, 364, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978) ("Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'") (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S. Ct. 501, 7 L. Ed. 2d 446 [1962]).

The United States Supreme Court, long ago, began expressing a special concern about the particularly unique responsibility held by those with prosecuting power.

> "[The United States Attorney] may prosecute with earnestness and vigor . . . . But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88-89, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

The Court warned that "appeals to passion and prejudice may so poison the minds of jurors even in a strong case that an accused may be deprived of a fair trial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 (1940). However, it also recognized that not every inappropriate action warranted reversal. 310 U.S. at 240 ("[E]ach case necessarily turns on its own facts. And where . . . the record convinces us that these statements were minor aberrations in a prolonged trial and not cumulative evidence of a proceeding dominated by passion and prejudice, reversal would not promote the ends of justice.").

15

Synthesizing the need to constrain prosecutors within the bounds of fairness and the need to sustain convictions not so tainted by error as to call the verdict into doubt, the Court decided to evaluate prosecutorial affronts to due process using the constitutional harmless error standard from *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

"The question [in *Chapman*] was whether a [prosecutorial] error was *per se* error requiring automatic reversal or whether the conviction could be affirmed if the reviewing court concluded that, on the whole record, the error was harmless beyond a reasonable doubt. In *Chapman* this Court affirmatively rejected a *per se* rule.

"... In holding that the harmless error rule governs even constitutional violations under some circumstances, the Court recognized that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial. ... *Chapman* reflected the concern, later noted by Chief Justice Roger Traynor of the Supreme Court of California, that when courts fashion rules whose violations mandate automatic reversals, they 'retrea[t] from their responsibility, becoming instead "impregnable citadels of technicality."'" *United States v. Hasting*, 461 U.S. 499, 508-09, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983) (quoting R. Traynor, The Riddle of Harmless Error 14 [1970]).

In *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986), the Court explained that it looks at whether the improper comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 [1974]); see also *Parker v. Matthews*, 567 U.S. ___, 132 S. Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (describing *Darden* as "[t]he 'clearly established Federal law' relevant" in evaluating improper comments by a prosecutor during closing argument).

16

In *United States v. Young*, 470 U.S. 1, 12, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985), the Court elaborated that "the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." (Citing *Lawn v. United States*, 355 U.S. 339, 359 n.15, 78 S. Ct. 311, 2 L. Ed. 2d 321 (1958); *Socony-Vacuum Oil Co.*, 310 U.S. at 242.)

Our own court has long summarized, articulated, and followed the constitutional harmlessness test from *Chapman* as follows:

> "[T]he error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Moreover, when analyzing both constitutional and nonconstitutional error an appellate court need only address the more demanding standard of constitutional error. *State v. Akins*, 298 Kan. 592, Syl. ¶ 3, 315 P.3d 868 (2014).

In one of our first opinions to discuss prosecutorial misconduct, the prosecutor had said of the defendant: "''You object, as is usual with felons overtaken and brought to trial.''" *State v. Comstock*, 20 Kan. 650, 653, 1878 WL 977 (1878). We opined in strenuous terms that such behavior was not to be permitted in criminal trials in Kansas:

> "Courts ought to confine counsel strictly within the facts of the case; and if counsel persistently go outside of the facts of the case in their argument to the jury, then

17

the court should punish them by fine and imprisonment; and if they should obtain verdict by this means, then the court should set such verdicts aside." 20 Kan. at 655.

Shortly thereafter, we again expressed our serious concern with improper prosecutorial statements to the jury:

"We take this opportunity, however, of calling attention to the duty of the district courts in jury trials, to interfere in all cases of their own motion, where counsel forget themselves so far as to exceed the limits of professional freedom of discussion. Where counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case, it is the duty of the court to stop him then and there. The court need not and ought not to wait to hear objection from opposing counsel. The dignity of the court, the decorum of the trial, the interest of truth and justice forbid license of speech in arguments to jurors outside of the proper scope of professional discussion." *State v. Gutekunst*, 24 Kan. 252, 254, 1880 WL 976 (1880).

Thus, early in our history this court placed the burden on trial courts to police prosecutors, directing judges to intervene even without objection, set aside verdicts that are based on improper arguments, and even to fine or imprison the offending attorney. See also *State v. Netherton*, 128 Kan. 564, 575, 279 P. 19 (1929) (holding that defendant's objection after the jury retired was sufficient because "the failure of the court to admonish the jury to disregard these remarks was error, even if the jury had retired from the room before the request was made"); *State v. Baker*, 57 Kan. 541, Syl. ¶ 4, 46 P. 947 (1896) ("Where the county attorney in his closing argument to the jury repeatedly uses abusive and improper language calculated to create prejudice against the defendant, and the court, after objection made, fails to check him or to instruct the jury to disregard his remarks, the defendant is entitled to a new trial.").

Along with developments in other jurisdictions—including federal courts—our decisions began to delineate a more standardized step-by-step approach to the dual

18

question of misconduct and prejudice. In *State v. Majors*, 182 Kan. 644, 647-48, 323 P.2d 917 (1958), we said:

> "It is the duty of a county attorney in a criminal prosecution to see that the state's case is properly presented with earnestness and vigor and to use every legitimate means to bring about a just conviction, but he should always bear in mind that he is an officer of the court and as such he occupies a quasi-judicial position whose sanctions and traditions he should preserve. (23 C.J.S., Criminal Law, § 1081, p. 519.) He should not appeal to the self-interests of the jurors including their social, class, and business prejudices (53 Am. Jur., Trial, § 499, pp. 402-403) and neither should he appeal to their self-interests as taxpayers. (33 A.L.R.2d anno. 459, *et seq.*; 53 Am. Jur., Trial, § 499, p. 403.) Appeals of this kind are generally highly improper and are not to be condoned because they are obviously prejudicial to the defendant's right to a fair trial."

Later, in *State v. Thompson*, 221 Kan. 176, 183-84, 558 P.2d 93 (1976), we declined to reverse a conviction following the prosecutor's improper closing argument, noting "there was nothing to indicate ill will on the part of the prosecutor. His remarks were not so gross and flagrant as to deny the accused a fair trial." We went on to say: "Where the evidence of guilt is of such direct and overwhelming nature that it can be said that the erroneous admission of certain other evidence could not have affected the result of the trial, such admission is harmless error." 221 Kan. at 183. It is not hard to see in *Thompson* the building blocks of the analytical framework we would more explicitly adopt in *State v. Pabst*, 268 Kan. 501, 508, 996 P.2d 321 (2000).

The *Pabst* court began by reciting the familiar principle that the "controlling question" is whether prosecutorial misconduct denied the defendant his or her due process rights to a fair trial. 268 Kan. at 504 ("Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's

19

constitutional right to a fair trial."). We then articulated the fundamentals of our two-part test:

> "The analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process. First, an appellate court determines whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced. Second, an appellate court must determine whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal." 268 Kan. 501, Syl. ¶ 3.

Surveying the variety of standards courts have utilized to measure prejudice, the *Pabst* court described the "[v]arious tests . . . for determining whether a defendant was prejudiced by improper comments that are so gross and flagrant as to prejudice the jury." 268 Kan. at 508, citing *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981), *cert. denied* 456 U.S. 989 (1982) (three-factor test for determining the existence of "substantial prejudice": [1] severity of the misconduct; [2] measures adopted to cure the misconduct; and [3] the certainty of a conviction absent the improper statements); *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976) (applying a four-factor test).

*Pabst* then cited the "*Thompson* factors" from 1976 and noted that our Court of Appeals had routinely looked to those factors to measure prejudice:

> """When determining whether prosecutorial misconduct was prejudicial, factors that should be considered include: (1) Is the misconduct so gross and flagrant as to deny the accused a fair trial? (2) Do the remarks show ill will on the prosecutor's part? (3) Is the evidence against the defendant of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors? [Citations

20

omitted.]"'"' *Pabst*, 268 Kan. at 508 (quoting *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461 [1997]).

A few years later, in *State v. Jones*, 273 Kan. 756, 782, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002), this three-factor test was cemented as the framework Kansas courts would use when evaluating the prejudice prong of our two-step analysis:

"The appellate court considers three factors to determine whether a new trial should be granted because of prosecutorial misconduct: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors." (Citing *Pabst*, 268 Kan. at 508.)

The stage was set for our decision in *Tosh*.

2. State v. Tosh

Just a few years after *Pabst* and *Jones*, in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), this court was clearly still frustrated by what it regarded at the time as a continuing lack of regard for its rules by prosecutors across the state. In response, we decided to adopt a remedy that "particularized" our harmlessness inquiry in the context of prosecutorial misconduct claims. Specifically, we decided to expand the general language of *Jones* by expressly infusing the harmlessness inquiry with a punitive purpose such that the standard test for harmlessness was not "controlling" but would become merely one factor to be balanced against the measure of culpability—defined by the prosecutor's state of mind and the relative egregiousness of his or her offense—displayed by the prosecutor deserving of punishment.

21

To begin, the *Tosh* court recited the well-known and often stated analytical path we follow when reviewing claims of prosecutorial error:

"A two-step analysis is applied to allegations of prosecutorial misconduct. First, the court decides whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, the court must decide whether the comments constitute plain error, that is, whether the statements are so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby requiring reversal. The facts of each case must be scrutinized in determining whether a prosecutor's remarks deny the defendant a fair trial. If the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs . . . ." 278 Kan. at 85.

The first step in this review—whether the actions of the prosecutor were outside the wide latitude afforded prosecutors—is sound and is left undisturbed by our decision today. The well-developed body of caselaw defining the scope of a prosecutor's "wide latitude" is likewise sound and will continue to inform our review of future allegations of prosecutorial error.

Our historical difficulties and frustrations have all arisen in the context of applying the second step of the analysis. The *Tosh* court expressed the nature of this frustration:

"In recent years this court and our Court of Appeals have reviewed case after case in which prosecutorial misconduct occurred and the State has argued that such misconduct was harmless error because there was overwhelming evidence against the defendant. The records and oral arguments in those cases have sometimes reflected an attitude on the part of prosecutors that a defendant can be denied a fair trial where the evidence is substantial. Taken to its logical conclusion, acceptance or endorsement of this attitude would lead to a rule that the greater the evidence against a defendant, the less right that defendant has to a fair trial. Neither law nor basic justice can tolerate such a

rule. Denial of a fair trial violates the due process rights of the guilty defendant just as surely as those of the innocent one.

.   .   .   .

"This court cannot tolerate prosecutors who ignore their special obligation as prosecutors and justify the violation of a defendant's right to a fair trial because the evidence against the defendant is substantial or overwhelming. The presence of substantial or overwhelming evidence against a defendant does not automatically excuse intentional violation of a defendant's right to a fair trial." 278 Kan. at 97-98.

This passage is the animating spirit of what became the *Tosh* rule, and we reaffirm our agreement with and ongoing commitment to its spirit and goals. To accomplish those goals, the *Tosh* court first recited the three factors to be considered in evaluating the second prong—the reversibility inquiry—of the two-step analysis:

"'The appellate court considers three factors to determine whether a new trial should be granted because of prosecutorial misconduct: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors.'" 278 Kan. at 93 (quoting *Jones*, 273 Kan. at 782).

We then commented that this "analysis requires a particularized harmlessness inquiry utilizing the three factors set out in *Jones*" and that "in our evaluation of the third of the three harmlessness factors in prosecutorial misconduct cases . . . [w]e must avoid using this factor and the weight of the inculpatory evidence as a default, a shortcut past careful comparison of the often competing influences of the first two factors." *Tosh*, 278 Kan. at 93, 97.

We explained that this particularized analysis was intended to ensure that

23

"our harmlessness inquiry in the unique setting of prosecutorial misconduct will be both practical *and punitive*, as it should be. Prosecutorial misconduct not only injects error into a criminal trial. It violates the prosecutor's ethical obligations. But we recognize that there are degrees of seriousness in such misbehavior, and our appellate courts must have the freedom to consider those degrees and their likely effects as they decide whether the misbehavior before them in a given case merits reversal and remand for new trial." (Emphasis added.) *Tosh*, 278 Kan. at 93-94.

We further suggested there was something at work in our particularized test beyond an ordinary review for harmlessness when we quoted with approval from the Oklahoma Criminal Court of Appeals' decision in *Hager v. State*, 10 Okla. Crim. 9, 133 P. 263, 264 (1913):  "'This court stands squarely for the doctrine of harmless error, but it is equally committed to the doctrine that fairness must prevail in the trial of criminal cases.'" *Tosh*, 278 Kan. at 98. Here we at least gestured towards the idea that there is a measure of "fairness" that can only be protected by punishing prosecutors via a reversal if and when the misconduct was otherwise harmless. See, *e.g.*, *Baker*, 57 Kan. at 545-47.

Nonetheless, the *Tosh* court continued to believe that the particularized test it had devised was—at the end of the day—still intended simply to determine whether the error was prejudicial and reversible under both the *Chapman* and the statutory harmlessness tests:  "[T]he second step of the analysis is essentially directed to whether the misconduct is so prejudicial that it denies the defendant a fair trial." *Tosh*, 278 Kan. at 93. And because the constitutional harmlessness test of *Chapman* is both mandated by the dictates of due process and more stringent than our statutory standard, we have routinely put our focus on the *Chapman* standard because "'the State necessarily meets the lower statutory standard under K.S.A. 60-261 if it meets the higher constitutional standard.'" *State v. Crawford*, 300 Kan. 740, 746, 334 P.3d 311 (2014).

24

After 12 years of application, we can now identify the "punitive" aspect of *Tosh*—extended from the concerns about gross and flagrant conduct and prosecutorial ill will recited in *Thompson*, *Pabst*, and *Jones*—as the discordant note in that court's effort to harmonize multiple goals in one test, *i.e.*, the purported balancing of the need to punish and deter bad prosecutorial acts against the need to guarantee a fair trial to defendants. We conclude that these interests—though appearing similar in nature on the surface—are in reality so distinct in character that they are impervious to any single incentive scheme. We agree with Sherman that to "balance" a prosecutor's level of culpability against the potential prejudice suffered by the defendant is to engage in a subtle—but very real—categorical error.

This balancing at the heart of *Tosh* resulted in a diminished judicial capacity to identify and appropriately protect the disparate interests and goals in play. Once this is seen and understood, a number of consequences become readily apparent: (1) courts were left with no analytical tools by which they could distinguish the broad class of unintentional prosecutorial error from the more pejorative class of misconduct—thus tainting merely negligent prosecutors with ethically tinged court rulings; (2) judicial efforts to punish and deter the truly bad actors that do exist have proven mostly ineffective, given that so often real misconduct is shielded from reversal by harmlessness and a finding of prosecutorial misconduct is significantly diluted by the fact that the same "sanction" is given to so many prosecutors who in reality have only carelessly erred; (3) courts have occasionally been led by a focus on punishing bad prosecutorial acts to overlook truly prejudicial errors because they were obviously "innocent" mistakes and bore no hallmarks of ill will or of gross or flagrant behavior; and finally, (4) other courts have occasionally made the opposite mistake of reversing constitutionally valid convictions simply because the prosecutor's actions, though harmless, were so egregious as to demand the only recourse *Tosh* left available—reversal.

In short, the asymmetrical system of reward and punishment inherent in our particularized harmlessness inquiry resulted in misaligned incentives. Our system can and must foster error-free prosecutions and deter actual misconduct—all while safeguarding the demands of justice for the protection of society through fair trials.

Given all of these considerations, we overrule the "particularized harmlessness inquiry" commanded by *Tosh* and adopt a new, simpler second step in our two-step analysis. In so doing, we narrow and rename our judicial review of prosecutorial behavior when such review occurs within a criminal appeal. Inside the confines of a criminal appeal, we will henceforth review prosecutorial behavior for—and describe such conduct as—"prosecutorial error."

We do not overrule precedent lightly and must give full consideration to the doctrine of stare decisis. We have recognized that "'once a point of law has been established by a court, it will generally be followed by the same court and all courts of lower rank in subsequent cases when the same legal issue is raised.'" *Simmons v. Porter*, 298 Kan. 299, 304, 312 P.3d 345 (2013) (quoting *Miller v. Johnson,* 295 Kan. 636, 653, 289 P.3d 1098 [2012]). Indeed,

> "'[s]tare decisis operates to promote system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by a court. . . . The application of stare decisis ensures stability and continuity—demonstrating a continuing legitimacy of judicial review. Judicial adherence to constitutional precedent ensures that all branches of government, including the judicial branch, are bound by law.'" *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 (2004) (quoting *Samsel v. Wheeler Transport Services, Inc*., 246 Kan. 336, 356, 789 P.2d 541 [1990]).

However, stare decisis "is not a rigid inevitability but a prudent governor on the pace of legal change." *State v. Jordan*, 303 Kan. 1017, 1021, 370 P.3d 417 (2016). "'A

26

court of last resort will follow that rule of law unless clearly convinced it was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.'" *Simmons*, 298 Kan. at 304 (quoting *Miller*, 295 Kan. at 653).

We are convinced that more good than harm will come from overruling *Tosh* and establishing a new framework. This is not a situation that particularly compels stare decisis. See, *e.g*, *State v. Quested*, 302 Kan. 262, 278, 352 P.3d 553 (2015) (doctrine particularly compelling when legislature free to alter statute in response to court precedent but declines to do so); *Crist*, 277 Kan. at 715 ("'Considerations in favor of stare decisis are at their acme in cases involving property and contract rights, where reliance interests are involved.'") (quoting *Payne v. Tennessee*, 501 U.S. 808, 828, 111 S. Ct. 2597, 115 L. Ed. 2d 720 [1991]). In fact, our new rule should bolster the justice system and serve both prosecutors and defendants. Moreover, although crafted with noble intentions and sound judicial goals, *Tosh* and other prior attempts to address this problem have proven unwieldy in light of judicial experience.

Below, we will first articulate the new two-part test for reviewing all claims of prosecutorial error. This includes any and all claims asserted by a criminal defendant that his or her Fourteenth Amendment due process rights to a fair trial have been violated by any act or statement of the prosecutor. Second, we will articulate how instances of the class of behaviors we will continue to refer to as prosecutorial misconduct will be treated from this point forward in Kansas. Finally, we will review Sherman's claim of prosecutorial error using the test we announce here.

3. *The Two-Step Analysis for Reviewing Claims of Prosecutorial Error*

Appellate courts will continue to employ a two-step process to evaluate claims of prosecutorial error. These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when "analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error." *State v. Sprague*, 303 Kan. 418, 430, 362 P.3d 828 (2015).

Parenthetically, we choose to note here that not all courts articulate the harmlessness analysis in the same way—though all aim at determining whether prosecutorial error prejudiced the defendant's due process rights to a fair trial. For example, the Tenth Circuit of the United States Court of Appeals adheres to a multi-part, *Tosh*-like test:

> "'A prosecutor's improper statement to the jury is harmless unless there is reason to believe that it influenced the jury's verdict. In assessing whether the misconduct had such an impact, we consider the trial as a whole, including the curative acts of the district

court, the extent of the misconduct, and the role of the misconduct within the case . . . [T]o warrant reversal, the misconduct must have been flagrant enough to influence the jury to convict on grounds other than the evidence presented.'" *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996) (quoting *United States v. Ivy*, 83 F.3d 1266, 1288 [10th Cir. 1996]).

The dizzying patchwork of harmlessness and error tests has resulted in significant confusion in this area of the law. As one commentator has observed:

"Application of this [patchwork] to cases of prosecutorial misconduct may produce considerable confusion. Some prosecutorial misconduct undoubtedly constitutes a violation of the due process clause of the fourteenth amendment. Other misconduct is presumably only trial error under state law. The issue usually turns on whether the misconduct deprived the defendant of a fair trial. Whether the misconduct deprived the defendant of a fair trial may, in turn, depend upon whether the misconduct was harmless error.

. . . .

"So long as the *Chapman* decision remains the law, it would be simpler for the courts to apply *Chapman*'s 'harmless beyond a reasonable doubt' standard to all cases of prosecutorial misconduct. Alschuler, *Courtroom Misconduct by Prosecutors and Trial Judges*, 50 Tex. L. Rev. 629, 664-65 (1972).

We have concluded that the broad common ground trod by all of these tests, and repeatedly emphasized by the United States Supreme Court, is the defendant's due process right to a fair trial. Keeping that right front and center in our analysis, we are convinced that applying the *Chapman* test to all claims of prosecutorial misconduct sidesteps the circular reasoning that sometimes results when it is unclear whether such claims have arisen as a matter of federal constitutional law or as a matter of state law. Today's decision expressly leaves open the possibility that a defendant may attempt in some future case to assert that a prosecutor committed a nonconstitutional trial error

29

under state law. In such cases, the statutory harmlessness test—K.S.A. 2015 Supp. 60-261—would apply.

Multiple and varied individualized factors can and likely will affect the *Chapman* analysis in future cases. Every instance of prosecutorial error will be fact specific, and any appellate test for prejudice must likewise allow the parties the greatest possible leeway to argue the particulars of each individual case. Thus, appellate courts should resist the temptation to articulate categorical pigeonholed factors that purportedly impact whether the State has met its *Chapman* burden. Appellate courts must simply consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.*, shown that there is no reasonable possibility that the error contributed to the verdict. The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry. As has often been repeated, prejudice can exist even "in a strong case." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 (1940).

4. *Prosecutorial Misconduct*

In the wake of the changes articulated above, we are left to determine how, henceforth, to properly punish and deter prosecutorial acts that can properly be described as misconduct. One possible resolution of the problems facing a court that must act to protect both the fair trial rights of defendants and the overall integrity of a criminal justice system involves an invocation of our inherent supervisory powers to reverse convictions—even when the error is harmless—as a sanction against particularly

egregious prosecutorial behavior. At least a few of our sister jurisdictions have taken this route. For example, Connecticut follows the rule that

"even when prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . Such a sanction generally is appropriate, however, only when the '[prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal.'" *State v. Pouncey*, 241 Conn. 802, 811-12, 699 A.2d 901 (1997).

The majority view, however, is that supervisory powers are not sufficiently omnipotent to permit the reversal of an otherwise constitutionally sound conviction. The Florida Supreme Court succinctly summarized this approach:

"The supervisory power of the appellate court to reverse a conviction is inappropriate as a remedy when the error is harmless; prosecutorial misconduct or indifference to judicial admonitions is the proper subject of bar disciplinary action. Reversal of the conviction is a separate matter; it is the duty of appellate courts to consider the record as a whole and to ignore harmless error, including most constitutional violations." *State v. Murray*, 443 So. 2d 955, 956 (Fla. 1984).

Last year, in *State v. Vrabel*, 301 Kan. 797, 812, 347 P.3d 201 (2015), we considered whether our supervisory powers were sufficient to exclude evidence obtained in violation of a statute but not in derogation of the defendant's rights:

"Alternatively, the *amicus* urges us to exercise our inherent supervisory authority to suppress evidence obtained in violation of state law. It points to the stance taken by the Hawaii Supreme Court in *State v. Pattioay*, 78 Hawaii 455, 896 P.2d 911 (1995). That case involved a violation of the Posse Comitatus Act (PCA) when a controlled drug buy conducted by the military led to a search warrant for the defendant's house. The Hawaiian

31

court recognized the general rule that a violation of the PCA did not require the application of the exclusionary rule. But the court reasoned that

> "'[t]he purpose of the exclusionary rule, as we see it, is primarily to deter illegal police conduct and secondarily to recognize that the courts of this State have the inherent supervisory power over criminal prosecutions to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts.' 78 Hawaii at 468.
>
> . . . .
>
> "At first blush, Hawaii's rationale of maintaining the integrity of the judicial process by refusing to justify and condone tainted evidence is mildly seductive. But a closer look at the purpose of K.S.A. 2014 Supp. 22-2401a convinces us that exclusion is not the appropriate remedy."

We concluded that the "statutory limitations" at issue were "put in place to protect the local autonomy of neighboring cities and counties, rather than to create an individual right." *Vrabel*, 301 Kan. at 813. Thus, suppression of evidence obtained in violation of that statute "will generally not be required." 301 Kan. at 813-14. We added that the propriety of this result is reinforced "in circumstances such as presented in this case where the defendant has not been prejudiced in the least by the [statutory violation]." 301 Kan. at 814. Thus, *Vrabel* stands for the general proposition that we will not exercise our supervisory powers simply to deter or punish bad behavior by state actors if the particular defendant in the particular case has not suffered either a violation of his or her rights or the error is otherwise harmless. This rationale counsels strongly against our adoption of the more expansive application of supervisory powers to punish and deter prosecutorial misconduct that is suggested by some of our sister states.

Likewise, this conclusion finds ample persuasive support in federal law. The Supreme Court in particular has been very skeptical of extending federal courts' supervisory authority to reverse convictions in the absence of prejudice. The Court has recognized such supervisory power as legitimate to "formulate . . . rules not specifically

32

required by the Constitution," which may serve to "preserve judicial integrity by ensuring that a conviction rests on appropriate considerations" and "as a remedy designed to deter illegal conduct." *United States v. Hasting*, 461 U.S. 499, 505, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983). But the Court went on to severely constrain such power when used by federal courts:

> "The goals that are implicated by supervisory powers are not, however, significant in the context of this case if, as the Court of Appeals plainly implied, the errors alleged are harmless. Supervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since by definition, the conviction would have been obtained notwithstanding the asserted error. Further, in this context, the integrity of the process carries less weight, for it is the essence of the harmless error doctrine that a judgment may stand only when there is no 'reasonable possibility that the [practice] complained of might have contributed to the conviction.' *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963). Finally, deterrence is an inappropriate basis for reversal where . . . means more narrowly tailored to deter objectionable prosecutorial conduct are available [such as attorney discipline].
>
> ". . . The conclusion is inescapable that the Court of Appeals focused exclusively on its concern that the prosecutors within its jurisdiction were indifferent to the frequent admonitions of the court. The court appears to have decided to deter future similar comments by the drastic step of reversal of these convictions. But the interests preserved by the doctrine of harmless error cannot be so lightly and casually ignored in order to chastise what the court viewed as prosecutorial overreaching." 461 U.S. at 506-07.

Following *Hasting*, in *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988), the Court carried this analysis a step further and held that Fed. R. Crim. Proc. 52(a) jurisdictionally restricts a federal court's use of supervisory power to dismiss an indictment without a showing of prejudice.

> "We now hold that a federal court may not invoke supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure

33

52(a). Rule 52(a) provides that '[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.' . . . The balance struck by the Rule between societal costs and the rights of the accused may not casually be overlooked 'because a court has elected to analyze the question under the supervisory power.' *United States v. Payner*, *supra*, at 736.

"Our conclusion that a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant is supported by other decisions of this Court [citing *Hasting*]." 487 U.S. at 254-55.

Given the weight of this authority, we need not determine whether we are jurisdictionally barred from exercising our supervisory authority to reverse convictions for egregious prosecutorial acts that do not prejudice the defendant. We are convinced by prudential considerations to follow the course suggested by the United States Supreme Court and conclude that reversal of a conviction is not an appropriate sanction for prosecutorial misconduct.

We are left to decide how to sanction prosecutorial misconduct regardless of the outcome of a criminal appeal. First, however, it is important to define the class of sanctionable behavior. Prosecutorial acts properly categorized as "prosecutorial misconduct" are erroneous acts done with a level of culpability that exceeds mere negligence. A prosecutor who acts with knowledge and intent outside the wide latitude afforded prosecutors, or with a malicious or gross disregard for the fair trial rights of the defendant, is subject to sanction for such misconduct in a separate proceeding outside the confines of the criminal case within which the misconduct occurred.

In determining the character of appropriate sanction for such misconduct, we are guided, in particular, by our prior instructions to district courts to affirmatively act to punish and deter particularly egregious prosecutorial acts. While the traditional remedy of a disciplinary referral remains a distinct likelihood when misconduct is an issue, we take

the additional step here of resurrecting our affirmative instructions to all courts in our state to discharge their duty to oversee the criminal justice system and ensure its integrity by issuing on the court's own motion—in any circumstances where the court in its discretion determines prosecutorial misconduct likely occurred—orders to offending prosecutors, to be heard in separate proceedings, to show cause why the prosecutor should not be found in contempt of court for his or her misconduct.

In so doing, we reiterate our commitment to deterring and punishing actual abuses of prosecutorial power. The prosecutorial bar is likewise put on notice that today's decision does not eliminate the punitive aspects of our prosecutorial misconduct jurisprudence. A prosecutor who knowingly and intentionally disregards the dictates of justice in Kansas courts does so at his or her peril.

5. *Applying the New Two-Step Analysis to Sherman's Claim*

We agree, and the State concedes, that the Mount Rushmore analogy would be error if it occurred today because such analogies are outside the wide latitude we currently permit prosecutors. In *Crawford*, the prosecutor used a puzzle-with-a-missing-piece analogy to discuss the reasonable doubt standard during voir dire and closing argument. We cautioned that

> "[t]he prosecutor's argument in this case demonstrates how differences in wording can move us from a conclusion that a prosecutor scuffed the line of misconduct to a conclusion that a prosecutor crossed the line. In this case the prosecutor did not attempt to distinguish between having no doubt and having a reasonable doubt, a distinction emphasized in the caselaw relied on in *Stevenson*." 300 Kan. at 755 (citing *State v. Stevenson*, 297 Kan. 49, 53, 298 P.3d 303 [2013]).

We noted that courts have regularly found error when a prosecutor used the puzzle analogy. *Crawford*, 300 Kan. at 754; see, *e.g.*, *United States v. Pungitore*, 910 F.2d 1084, 1128 (3d Cir. 1990) (puzzle analogy was error but did not result in prejudice); *People v. Katzenberger*, 178 Cal. App. 4th 1260, 1267-68, 101 Cal. Rptr. 3d 122 (2009) (Slide show of puzzle pieces forming the Statue of Liberty, leaving two pieces missing was error, noting: "The presentation, with the prosecutor's accompanying argument, leaves the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence. It invites the jury to guess or jump to a conclusion, a process completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt. . . . Specifically, the puzzle of the Statue of Liberty is composed of eight pieces. When the sixth puzzle piece of the slide show was in place, leaving two missing pieces, the prosecutor told the jury, 'this picture is beyond a reasonable doubt,' inappropriately suggesting a specific quantitative measure of reasonable doubt, *i.e.*, 75 percent."); *Lord v. State*, 107 Nev. 28, 35, 806 P.2d 548 (1991) (statement by prosecutor suggesting that having 90-95 percent of the pieces of a puzzle suffices to convict beyond a reasonable doubt was error but not prejudicial); see also *People v. Wilds*, 141 App. Div. 2d 395, 398, 529 N.Y.S.2d 325 (1988) (An analogy using a jigsaw puzzle of Abraham Lincoln was error because "the average American juror would recognize a jigsaw puzzle of Abraham Lincoln, long before all of the pieces are in place. Obviously, this is not the quantum of proof required in a criminal case.").

Like the jigsaw puzzle cases, the prosecutor's use of the Mount Rushmore image and the question, "Do you have a REASONABLE DOUBT this is Mt. Rushmore??" equated the lack of reasonable doubt with a standard that unavoidably included the jury's prior personal knowledge concerning a recognizable landmark. Specifically, the prosecutor's statement, "But there's a gap. You're allowed to fill in those gaps, folks," improperly equated a juror's prior knowledge about the picture being displayed to his or her "life experience." Such illustrations are inappropriate because they foster the illusion

that the jurors already know the full picture of the case they are hearing and are simply looking for pieces of evidence to match it. In fact, we insist that jurors have minimal to no prior knowledge of a case precisely to prevent them from seeking evidence to confirm a preconceived narrative and conclusion.

At the time Sherman was tried, however, in 2007, prosecutorial use of the puzzle analogy was still a common practice. Only a year before *Crawford*, in *Stevenson*, 297 Kan. 49, the prosecutor displayed a sign printed with "Wheel of Fortune" completely spelled out save for one missing letter. The prosecutor then noted that although a letter was missing, there was no reasonable doubt about what letter was needed to complete the title. The prosecutor continued:

> "'As to reasonable doubt, when we apply that standard, does anybody think that I'm going to have a videotape of exactly how everything happened? It would be impressive if I did, right? If you were there, you saw every step of the way, that would be beyond all doubt.
>
> "'Does anybody think I have to put you in that position?
>
> . . . .
>
> "'. . . Now, what if in your mind I have put on enough evidence to prove beyond a reasonable doubt that it occurred this way. Okay. So you are to that point, you've made your decision beyond a reasonable doubt.
>
> "'But then you say you know what, I wish they would have done whatever.'" 297 Kan. at 52.

The prosecutor continued by saying: "'Does everybody understand what I'm trying to say here? That I have to put on enough evidence to prove beyond a reasonable doubt? I do not have to put on every possible piece of evidence in existence . . . .'" 297 Kan. at 53.

We held in *Stevenson* that the prosecutor was "drawing a distinction between the concept of proof beyond a reasonable doubt and proof beyond all doubt, rather than attempting to provide a meaning for 'reasonable doubt.'" 297 Kan. at 53. Likewise, we found the prosecutor's statements "did not state or imply that the State's burden of proof was anything less than beyond a reasonable doubt." 297 Kan. at 54. Even though the statement was not error, we warned that "[t]he prosecutor's comments in this case scuffed the line of misconduct," and we "discourage[d] use of the 'Wheel of Fortune' analogy." 297 Kan. at 55.

We find the Mount Rushmore analogy and the manner it was used in Sherman's case sufficiently similar to the *Stevenson*'s Wheel of Fortune analogy to conclude—given that it occurred many years prior to *Stevenson*—that it too may have scuffed the outside edge of the wide latitude afforded prosecutors at the time Sherman was tried, but it did not cross it. The prosecutor here was clearly attempting to demonstrate through analogy that the State's burden does not require it to present a case beyond all doubt. Perhaps more importantly, the prosecutor received express permission from the trial court to present this line of reasoning to the jury during closing arguments.

Although our decision in *Crawford* reined in the use of jigsaw puzzle analogies—and we emphasize today that such analogies are improper and to be avoided—Sherman's prosecutor must be evaluated based on the state of the law at the time of his trial. Therefore, we hold that under the somewhat strange circumstances of this delayed appeal, the prosecution did not venture outside the wide latitude given to it at the time of trial.

*The District Court Did Not Err in Denying Sherman's Motion for Mistrial After the State Inadvertently Violated the Order in Limine Because Sherman Was Not Prejudiced.*

Sherman next argues the district court erroneously denied his motion for mistrial after the State played a recording for the jury of Sherman's interview with law

38

enforcement referencing his prior criminal history. The State first argues this issue is not preserved for review because Sherman did not object to the admission of the tape or Sherman invited the error. The State then argues the district court did not abuse its discretion in denying the motion because the same evidence was heard by the jury without objection later in the trial during the cross-examination of the defendant. We conclude that the issue is properly preserved for appeal and the district court found a fundamental failure occurred. However, the decision to deny the motion for mistrial is affirmed because it is impossible to conclude this failure prejudiced Sherman when the State brought in the same type of prior crimes evidence later in the trial without objection.

1. *Standard of Review*

This court reviews a district court's decision denying a motion for mistrial under an abuse of discretion standard. We ask:

"(1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?" *State v. Waller*, 299 Kan. 707, 726, 328 P.3d 1111 (2014).

"Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must

39

determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial." 299 Kan. 707, Syl. ¶ 3.

"A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact." *State v. Moore*, 302 Kan. 685, 692, 357 P.3d 275 (2015).

### 2. *Sherman Was Not Prejudiced.*

The parties spend considerable time contesting whether a fundamental failure occurred in the proceeding. However, we do not need to grapple with that question when, as here, there is clearly no possible showing of prejudice given that identical or substantially similar evidence was heard by the jury without any objection. Thus, we can assume without deciding that the playing of the tape constituted a fundamental failure and move directly to a consideration of the prejudice prong.

At the trial court level, the second prong requires the district court judge to "decide whether the prejudicial conduct made it impossible to continue the proceeding without denying the parties a fair trial. . . . Under the second step, the court considers whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice." *State v. Warren*, 302 Kan. 601, 608, 356 P.3d 396 (2015). "The degree of certainty required to conclude an injustice did not occur varies depending on whether the fundamental failure infringes on a constitutional right or not." *State v. McCullough*, 293 Kan. 970, 981, 270 P.3d 1142 (2012).

"Violations of K.S.A. 2013 Supp. 60-455 are subject to the nonconstitutional harmlessness standard of K.S.A. 2013 Supp. 60-261. See *State v. Preston*, 294 Kan. 27, 35-36, 272 P.3d 1275 (2012). Under that standard, the party benefitting from the error has the burden of showing that 'there is no reasonable probability the error affected the trial's

40

outcome in light of the entire record.' *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012)." *State v. Verser*, 299 Kan. 776, 786, 326 P.3d 1046 (2014).

"Appellate courts reviewing the second part for an injustice may take a broader view than the trial court because appellate courts may examine the entire record." *McCullough*, 293 Kan. at 981.

Given these layered standards, we must determine whether the State has met its burden to demonstrate there is no reasonable probability the error in admitting the prior bad acts evidence affected the trial's outcome in light of the entire record. The State claims that this error did not affect the outcome of the trial because the State essentially repeated this evidence during the defendant's cross-examination without objection. We agree. Specifically, Sherman testified without objection that he did not call 911 after he saw the injured Mendez because he knew there was an outstanding warrant for his arrest stemming from a probation violation in an earlier conviction for criminal damage. No objection was lodged on the grounds that the question or series of questions were seeking to elicit inadmissible evidence of Sherman's prior bad acts or criminal history.

Because the jury heard—without objection—the precise facts Sherman claims should not have been presented to the jury via his recorded interview with law enforcement, it is impossible to say there is a reasonable probability the error affected the outcome. The district court gave appropriate curative instructions and did not abuse its discretion in refusing to grant a mistrial.

*Sherman's Due Process Claim Due to Appellate Delay is Moot.*

Finally, because we have found no reversible error, Sherman's claim that a retrial would violate his due process rights due to the long delay between the filing of his notice of appeal and its final adjudication is moot.

Affirmed.